**IN THE U.S. DISTRICT COURT
FOR DISTRICT OF MARYLAND**

| | |
|---|---|
| **Mr. Sharn Chapman** | * |
| **et al.** | * |
| ***On behalf of themselves and*** | * |
| ***others similarly situated*** | |
| | * |
| **Plaintiffs** | |
| | * |
| **v.** | * **Case No. AW 08-2545** |
| | * |
| **Ourisman Chevrolet Co., Inc.** | * |
| **et al.** | * |
| **Defendants** | * |
| _____/ | |

**PLAINTIFFS' CROSS MOTION FOR PARTIAL
SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs, by and through undersigned counsel, move pursuant to Fed.R.Civ.P. 56 for

partial Summary Judgment against the Defendants, and oppose Defendants' Motion for Partial

Summary Judgment (doc. 90), and for good cause, states as follows:

**I.      Standard of Review**

"When faced with cross-motions for summary judgment, the court must review each

motion separately on its own merits 'to determine whether either of the parties deserves

judgment as a matter of law.' " Rossignol et al. v. Voorhar, et al., 316 F.3d 516, 523 (4th Cir.

2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997) (citation

and internal punctuation omitted)).  "When considering each individual motion, the court must

take care to 'resolve all factual disputes and any competing, rational inferences in the light most

favorable' to the party opposing that motion." <u>Id.</u> (quoting <u>Wightman v. Springfield Terminal Ry. Co.</u>, 100 F.3d 228, 230 (1st Cir. 1996).

" '[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede no issues remain in the event his adversary's theory is adopted.' " <u>Teksystems, Inc. v. Bolton</u>, 2010 WL 447782, *4 (D. Md. Feb. 4, 2010) (quoting <u>Nafco Oil & Gas, Inc. v. Appleman</u>, 380 F.2d 323, 325 (10th Cir. 1967) (alteration in original)).   There may always be a basic disagreement over what facts are material.   However, when cross motions for summary judgment demonstrate a basic agreement concerning what legal theories and materials facts are dispositive, the motions " 'may be probative of the non-existence of a factual dispute.' " <u>Teksystems</u>, <u>supra</u> (quoting <u>Shook v. United States</u>, 713 F.2d 662, 665).

"To effectuate the goals of the [Federal Fair Labor Standards Act, 29 U.S.C. 201 et seq. ("FLSA")], courts construe coverage under the FLSA 'liberally to apply to the furthest reaches consistent with congressional direction.' " <u>Shaliehsabou v. Hebrew Home of Greater Washington, Inc.</u>, 363 F.3d 299, 305 (4th Cir. 2004).   Courts undertake their duty to determine whether wage payment plans are in substantial compliance with the FLSA by construing the remedial provisions both narrowly and sensibly.   <u>See</u> <u>Klinedinst v. Swift Investments, Inc.</u>, 260 F.3d 1251, 1254 (11th Cir. 2001).

In a case such as this, where the duration of the pay period is in dispute, the employer has the burden of proving the duration of its pay period.   <u>Olson v. Superior Pontiac-GMAC, Inc.</u>, 765 F.2d 1570, 1575 (11th Cir. 1985) ("we hold the *employer* has the burden of proving the duration of its pay period.").   Moreover, "the employer bears 'the burden of segregating permissible deductions from impermissible ones.' " <u>Demezier v. Ravede Ins. Agency, Inc., et</u>

al., 2010 WL 680837, *1 (S.D. Fla. Feb. 18, 2010) (quoting Brennan v. Veterans Cleaning Serv., Inc., 482 F.2d 1362, 1370 (5th Cir. 1973)).

## II.     Statement of Undisputed Material Facts

This is a case involving auto salespersons who have collectively sued to recover minimum wage payments owed to them under the FLSA, but as set forth below, the Defendants' arguments turn well-established FLSA case law and regulations upside, and threaten the efficient enforcement of the FLSA.  It is no exaggeration to state that this case has broad implications for all commissioned salespersons throughout a variety of industries nationwide.

The most significant issue in this case, which threatens to unravel the wage protections of countless commissioned sales workers is whether an employer, like the Defendants, can carry their burden of demonstrating that they pay wages on a monthly pay period basis.  If this burden is demonstrated here, with so much contradictory evidence, employers like the Defendants will be able to avoid the minimum wage obligations by spreading weekly earnings across the month.

In addition, there are other issues as well.  For example, the Defendants seek to hide behind a Department of Labor investigation into their wage practices, by amazingly turning a finding of non-compliance into an endorsement of their wage payment plans.  Therefore, one issue is whether the Defendants acted reasonably and not recklessly when they failed to monitor salesperson earnings so as to avoid minimum wage damages, even using a monthly pay period, despite the fact that they received a specific warning from the U.S. Department of Labor.

Another issue is how far a Defendant can credibly go in order to disclaim personal liability.  In particular, the Plaintiffs submit that it cannot be credibly maintained that Chris

Ourisman, the son of Ourisman Chevrolet's President, John Ourisman, is a mere trainee without any supervisory authority or responsibility for the undisputed FLSA violations.

The final significant issue is whether deductions from salespersons' wages for quintessential business losses and expenses, that reduce a salesperson's pay below the minimum wage, are legal under the FLSA. Plaintiffs intend to ask the Court for Summary Judgment on each one of these issues.[1]

### A.    Defendants' Pay Plan and Policy/Practice of Taking Deductions.

Defendants have produced a written pay plan that they allege covered the Plaintiffs as well as other salespersons. (Exh. 1; Ourisman Pay Plan for Vehicle Salespersons). By its plain terms, there are a number of payments that a salesperson may receive. (Exh. 1). In roman number I, Ourisman agrees to pay a commission "equal to twenty percent (20%) of the unit gross profit of a new or used vehicle." Critically important, it is undisputed that this commission is paid weekly. (Exh. 1 & Exh. 2; Depo of Carla Hampton 5/25/10, pg. 52-53). According to Ms. Carla Hampton, the payroll clerk of Ourisman Chevrolet, no portion of this commission is withheld. (Exh. 2, pg. 53; see also Exh. 3; 30(b)(6) Depo of John Ourisman 8/4/10, pg. 170-74). Each Friday at Ourisman Chevrolet is a payday. (Exh. 2, pg. 79). So, for example, if a salesperson sells an automobile on Monday, and the sale is processed by Wednesday (meaning the paperwork is complete), a check for the commission on that automobile's "unit gross profit" is issued on the Friday of that same week. (Exh. 2, pg. 56). Therefore, if a salesperson has no sales for that workweek, they may not receive any pay whatsoever for that workweek. (Exh. 3; pg. 100).

---

[1]    In this Motion, Plaintiffs seek Summary Judgment as to other issues as well. These issues are undisputed and uncontested, as Defendants have stipulated to certain issues such as the employer status of Defendant Abbas Khademi and FLSA coverage of the Defendants.

In addition to the weekly commission paychecks, there are other payments made under the Pay Plan.  Defendants like to insist on the characterization that all payments under the Pay Plan are "commissions," with the weekly commissions being "partial commissions," but Defendants have acknowledged that the Pay Plan speaks for itself, (Exh. 3, pg. 249), and Roman Numeral II clearly sets forth a bonus schedule.  (Exh. 1; Exh. 2, pg. 99).  Under Roman Numeral II of the Pay Plan, salespersons may receive a "monthly bonus," depending upon the average number of vehicles that they sold for the last two months.  (Exh 1; Exh. 4; Depo of Abbas Khademi, 7/8/10, pg. 86).  Salespersons are assigned a "sales track" under Roman Numeral II.  (Exh. 1 & Exh. 2, pg. 93).  A salesperson's sales track under the pay plan is determined by calculating the amount of vehicles sold for the last two calendar months, and dividing it by 2 to obtain the monthly average.  (Exh. 3, pgs. 35-36).  This bonus is paid on the 10th of the following month.  (Exh 2, pg. 56).  Monthly settlement sheets are prepared that record the month-end bonuses.  (Exh. 5).  So, for example, bates 5007 – which represents a monthly settlement sheet – reveals that this particular salesperson made no earnings beyond what he/she may have been paid on a weekly basis.  (Exh. 6; 30(b)(6) Depo of Teresa Bryd 8/4/10, pg. 64-65).  Defendants admit that it is possible for a salesperson to receive commissions under Roman Numeral I and not receive bonuses under Roman Numeral II.  (Exh 7; Depo of John Ourisman 8/4/10, pg. 225-27).  While Defendants are not certain, they claim that this happens infrequently, but it could be one month per year, or even more.  (Exh. 7, pg. 227).

Some bonuses are not paid on the 10th of the following month, but are paid at practically any time.  (Exh. 2, pg. 96).  These bonuses would include the "sales contests and spiffs" and "year end bonus" described in Roman Numerals IV and V of the Pay Plan.  (Exh. 1, pg. 3).

Within the Pay Plan, there is a section titled "Minimum Wage Guarantee."  (Exh 1, pg. 5).  This section states:

> 1.      Each salesperson is guaranteed the minimum wage requirement for each hour worked each month; and at the end of each month the EMPLOYER will pay the amount due, if any, under the minimum wage requirement for the month, <u>or</u> the remaining amount of commissions and/or bonuses earned for the month whichever is greater.  Any payments will be limited by the hours scheduled by management in the beginning of each month.  Claims, if any, must be made within the following month.

(Exh. 1, pg. 5).

Defendants claim that it calculates the minimum wage by gathering timesheets, adding them up, determining how much compensation (commissions, bonuses, sales contest earnings, etc.) was earned, and then paying the difference (if any).  (Exh. 6; 30(b)(6) Depo of Teresa Bryd 8/4/10, pg. 49).

But the undisputed evidence is that the Defendants do not even follow their own minimum wage "guarantee."  Defendants admit that they have not always calculated the minimum wage each month.  (Exh. 6, pg. 50).  Ms. Carla Hampton, the payroll clerk, testified that Ms. Teresa ("Terry") Bryd "probably" told her to compare earnings to the minimum wage requirements, but she had no recollection when this might have been done.  (Exh. 2, pgs. 151-52).  According to Ms. Hampton, the "minimum wage was never an issue until the economy went bad."  (Exh. 2, pg. 151).  Some salespersons had to go to Ms. Hampton and request the minimum wage, because as Ms. Hampton explained that these were not the type of persons "that you would even consider looking at to see if they made the minimum wage."  (Exh. 2, pg. 154).  For his part, John Ourisman – speaking on behalf of Defendant Ourisman Chevrolet – admitted that there were "a few oversights, clerical kind of errors," in relation to the calculating the minimum wage according to the Defendants' monthly review.  (Exh. 3, pgs. 107-08).  Based on Defendants' monthly pay period, and despite their "guarantee," the Defendants

violated their own Pay Plan an astonishing 24 times.  (Exh. 3, pg. 109).

Not surprisingly, no documents exist that corroborate Defendants' claims of maintaining a monthly pay period in which they paid the minimum wage.  For example, Defendants admit that Ms. Hampton did not create any records when she allegedly performed minimum wage reconciliations.  (Exh. 8; 30(b)(6) Depo of Carla Hampton 8/4/10, pg. 19).  If she was in fact performing minimum wage reconciliations, calculations, Ms. Hampton knew astonishingly little about the minimum wage: she was unsure when the minimum wage increased, could only guess what the rate was before the latest increase in the minimum wage in July of 2009, and could not recall how she handled changes to the minimum wage occurring in the middle of the month. (Exh. 8, pgs. 10-14, 19).

Defendants claim that when they did pay minimum wages using their self-defined monthly pay period, they were paid <u>after</u> the 10th of the following month, possibly three or four days later.  (Exh. 6, pg. 43).

**B.      Defendants' Peculiar Manner of Charging Back Business Expenses and Business Losses Against Their Salesperson's Wages.**

While Defendants claim that they performed minimum wage reconciliations using their self-defined monthly pay period, they admit that the numbers that they used were based on "gross wages."  (Exh. 8, pg. 25, 30).

However, what a salesperson earns in gross wages at Ourisman, versus what they actually net less "deductions" are two totally separate things.  In addition to the deductions for taxes, child support, garnishments (legal deductions), the Defendants have an extensive practice of taking "AR" (accounts receivable) deductions from their salespersons.  (Exh. 8, pgs. 27-29). These AR deductions were taken after deductions for taxes were taken ("below the line"). (Exh. 9; Depo of Teresa Bryd 5/25/10, pgs. 68-69).

AR deductions include "hold notes," "customer payoffs," cash shortages, warranty work on used car purchases, deductibles on cars damaged by salespersons, and work shirts (emblazoned with the Ourisman logo).  (Exh. 8, pgs. 27-29; Exh. 4, pg. 179; Exh. 2, pg. 81; Exh. 10 [Deduction Agreement]).  Deductions could also include an employee savings account which would be used to formulate a "year end bonus." (Exh. 1, pg. 3).  These deductions are taken when a salesperson owes money back to Ourisman Chevrolet.  (Exh. 2, pgs. 59-60).  On a paycheck, these deductions appear non-itemized and are lumped together with health insurance charges, child support garnishments, etc.  (Exh. 2, pgs. 83-85).  Mr. Abbas Khademi, the former General Manager of Ourisman Chevrolet, testified that deductions were "frequent."  (Exh. 4, pg. 174-75).

Deductions were made out of the next available wage payment.  (Exh. 4, pgs. 171-72).  "Hold notes" – also known as "promissory notes" – refers to the practice whereby a customer wants to purchase a car, and wants to put down a certain amount of down payment, but they are without sufficient ability to make the down payment.  (Exh. 2, pg. 103).  In such a case, the customer will be able to purchase the vehicle with no money down, but with the promise of returning with the down payment money.  Id.  If the customer does not fulfill its promise to return with the down payment (which is often the case), the customer's default is charged back against the salesperson.  (Exh. 2, pgs. 103-04).  To this day, Defendants continue this practice.  (Exh. 3, pgs. 114-15).  Incredibly, John Ourisman claims that the practice of using hold notes with customers (with salesperson guarantees) was based upon the requests of salespersons and maintained pursuant to their demands.  (Exh. 3, pgs. 120-21).  John Ourisman claims that claims that hold notes do not allow for more automobiles to be sold, "it just accelerated the accounting of those sales."  (Exh. 3, pg. 122).  John Ourisman claims that the vehicles were

sold by the time hold notes were utilized, but he is forced to admit that title has not transferred by this time.  (Exh. 3, pgs. 122-23).

"Customer payoffs" or "payoff differences" refers to the difference between what a customer informed the salesperson as to what is still owed on the automobile, versus what the customer actually owes.  (Exh. 2, pg. 82).  For example, if a customer tells a salesperson that he owes $10,000.00 on his car, and he actually owes $15,000.00, the difference of $5,000.00 would have to be repaid by the salesperson.  (Exh. 2, pg. 83).

Although John Ourisman tried to claim that customer repairs were not deducted from a salesperson's pay, he was forced to admit that if a repair is necessitated by a warranty or by the decision of the sales manager (even if based on customer good will), the cost of the repair would be charged back or deducted from the salesperson's future earnings.  (Exh. 7, pgs. 128-29).

Even the deductions for the "year end" or "Christmas" bonus, a form of employees savings, was not itself free from potential charge backs for money allegedly owed to the Defendants.  The year end bonus could be lost to deductions owed to the Defendants.  (Exh. 4, pgs. 183-86).

### C.      The Reasonableness of Defendants' Pay Plan and Wage Practices.

The Pay Plan was drafted by Mr. John Ourisman, the President of Ourisman Chevrolet. (Exh. 11; Depo of John Ourisman 6/23/2010, pg. 82).  Mr. Ourisman cannot recall whether he talked to an attorney when he drafted his pay plan.  (Exh. 3, pg. 54-55).  Mr. Ourisman had no discussions with sales managers to determine whether the Pay Plan that he had drafted was actually being followed.  (Exh. 7, pg. 202).  In addition, Mr. Ourisman has not talked with sales managers regarding the actual application of the Pay Plan.  (Exh. 7, pg. 219).

Mr. Ourisman admits that he knew of the minimum wage requirements under the law as far back as 1999.  (Exh. 11, pg. 110).  Likewise, Abbas Khademi knew back when he started his automotive sales career with "Darcars" in the early 1990s, that salespersons must make the minimum wage.  (Exh. 4, pgs. 26-29).  Mr. Ourisman claims that he tries to stay abreast of minimum wage requirements by reading trade publications, attending trade conferences, and reading magazines and newspapers.  (Exh. 3, pg. 46).  Mr. Ourisman claims that at various trade conferences, it was discussed that the minimum wage is required by law, that it must be paid, that records need to be kept, and that employers must be aware of increases in minimum wage rates.  (Exh. 3, pgs. 50-51).

It is beyond dispute that sometime in 2005, the U.S. Department of Labor initiated an investigation (audit) of Ourisman Chevrolet.  The Defendants have only produced a letter disclosing the violations that were found.[2]  (Exh. 12).  The letter contains a "Back Wage Compliance and Payment Agreement."  (Exh. 12).  Among other things, it states that Mr. Ourisman has agreed to monitor "settlement earnings for car salesmen to at least meet the minimum wage requirement."  (Exh.12).  The letter, written by the Baltimore District Director of the U.S. Department of Labor, warns Mr. Ourisman that "[i]f at any time in the future your firm is found to have violated the monetary provisions of the FLSA," it would be subject to the penalties for "repeated or willful violations… ."  (Exh. 12).

Ms. Teresa Bryd, the Office Manager, was the point person for the Department of Labor audit.  (Exh. 6, pg. 73).  Ms. Bryd dealt with Mr. Alberto Raymond, the Department of Labor investigator, and she assisted his review and acquired documents for him.  (Exh. 6, pg. 73).

---

[2]       Curiously, Defendants have produced no other documents, such as any initial letter seeking access to the wage records of Ourisman or any demand for the production of documents.  According to Defendants, this is the only document that exists based on the Department of Labor investigation, which is very hard to believe.

According to Ms. Bryd, Mr. Raymond did not request wage documents relating to the salespersons.  (Exh. 6, pgs. 73-74).  Ms. Bryd was unsure whether Mr. Raymond interviewed the salespersons, and she had no conversations with him regarding the salespersons.  Id. at 74. While any documents that would have been reviewed would have been accumulated by Ms. Bryd, (Exh. 6, pg. at 76), Ms. Bryd did not know whether the Department of Labor asked for the work schedules or timesheets of the salepersons.  (Exh. 9, pgs. 58-59).  Mr. Ourisman, speaking as a 30(b)(6) witness, was unsure what documents were turned over to, much less reviewed by, the Department of Labor.  (Exh. 3, pgs. 42-43, 58-59).  Mr. Ourisman did not even know whether Mr. Raymond reviewed the Pay Plan.  (Exh. 11, pg. 155, line 16).

Mr. Ourisman also does not know whether a salesperson's complaint to the Department of Labor generated the inspection, and he does not know whether the Department of Labor reviewed all of the commission reports and payroll records pertaining to salespersons.  (Exh. 3, pgs. 58-59).  Mr. Ourisman could not describe the extent of the Department of Labor investigation.  (Exh. 3, pg. 72).  Mr. Ourisman agrees that the Department of Labor did not give its stamp of approval regarding Defendants' wage payments to salespersons, but simply claims that the Department of Labor did not find any wrongdoing.  (Exh. 3, pg. 72, lines: 14-17).

While Mr. Ourisman claims that he took the letter from the Department of Labor as a warning (he denies that was the purpose of the letter), (Exh. 3, pgs. 84-85, lines: 14-17), Mr. Ourisman claims that Defendants adhered to the terms of the letter from the Department of Labor.  (Exh. 3, pg. 74).

But if Mr. Ourisman took this as a warning, it is certainly does not appear that way. According to Ms. Teresa Bryd, nothing changed at Ourisman after the September 2005 Department of Labor warning letter.  (Exh. 6, pg. 51).  Mr. Ourisman testified that the only

thing that Ourisman did differently as a result of the Department of Labor investigation was require painter helpers to clock in and out and assign more managerial duties to Ms. Sylvia Abdoh (who the dealership has misclassified as being exempt). (Exh. 3, pg. 70-72). No business records were maintained demonstrating compliance with the requirement that Ourisman monitor the earnings of salespersons. (Exh. 3, pg. 74).

No policy was put into place requiring salespersons to report their actual hours worked. (Exh. 11, pg. 124). Mr. Ourisman could not recall whether he ever followed up with his General Manager, Abbas Khademi, after the Department of Labor investigation. (Exh. 11, pg. 158, 173). Moreover, Mr. Ourisman could not recall whether he had someone audit Ourisman's wage/hour practices after the Department of Labor investigation. (Exh. 11, pg. 171). Mr. Ourisman admitted that the only step that he took was to send a copy of the letter to his CFO and General Manager. (Exh. 11, pgs. 172-73). No one at the dealership took any seminars or courses in the FLSA after receipt of the Department of Labor letter. (Exh. 9, pg. 49).

Given this lack of interest, it is not surprising that Mr. Ourisman admits that the Defendants committed minimum wage violations, assuming arguendo that the Court accepts their self-serving monthly pay period claim (and the use of gross wages as opposed to net wages to determine compliance with minimum wages). According to the payroll clerk Ms. Carla Hampton, she states that Ms. Bryd "probably" told her to compare earnings to the minimum wage, but she has no firm recollection of that ever happening. (Exh. 13;Depo of Chris Ourisman 7/8/2010, pg. 151-52). Moreover, Ms. Bryd never mentioned anything about the impact of AR deductions on minimum wage calculations. Id. According to Ms. Hampton, salespersons did not strike her as the type of worker "that you would even consider looking at to see if they made the minimum wage." (Exh. 13, pg. 154).

One issue in particular is the issue of timesheets.  Accurate timesheets are necessary in order to calculate the minimum wage properly.  If a timesheet was not submitted for a salesperson to Ms. Hampton, she simply assumed that the person was not at work for that week. (Exh. 8, pg. 20).  In addition, Ms. Hampton testified that she simply went by the total listed on the timesheet, and that she did not review the timesheet for accuracy.  (Exh. 8, pgs. 21, 23). Ms. Bryd testified that she knew of instances where salespersons have worked but there might not be a corresponding timesheet.  (Exh. 6, pg. 53).

Another issue was the fraud on the timesheets.  For example, Plaintiff Sidney Rose has stated that under-reporting hours on timesheets was a requirement in order to be paid for salespersons at Ourisman.  (Exh. 14).  Managers would not sign the timesheet if Mr. Rose reported his actual work hours.  (Exh. 14).[3]  Although he under-reported his hours, astonishingly there is evidence that Mr. Rose's signature on certain timesheets was forged. (Exhs. 14 & 16).  Ms. Bryd admitted that it looked like four different signatures for Mr. Rose, and she further remarked that it just looked "terrible."  (Exh. 6, pg. 56).  Defendant Abbas Khademi, the former General Manager, testified that sales managers would just sign the timesheets and not make sure that the information on the timesheet, such as the total hours worked, was accurate.  (Exh. 4, pg. 130).  Numerous timesheets had incorrect totals, (Exh. 17), which were only corrected after this lawsuit was filed.  (Exh. 6, pg. 54).

With all of the self-admitted problems with resting their *alleged* monthly reconciliation of minimum wages upon timesheets, one would assume that Ourisman would require its

---

[3]     Similarly, the Sales Managers refused to sign the time sheets prepared by Plaintiff Patricia Merrick if she put down her actual hours of work.   (Exh. 15, ¶ 4).

salespersons to punch a time clock.  The undisputed testimony is that employees in the service and parts departments punch in and out of a timeclock.  (Exh. 13, pgs. 80-81).  However, Defendant Khademi has explained that getting salespersons to clock in and out is "like getting attorneys to stop doing frivolous lawsuits."  (Exh. 4, pg. 154).  Defendant Khademi further explained that salespersons could not be relied upon to clock in and out.  (Exh. 4, pg. 156).  In contrast, Mr. John Ourisman testified that salespersons were not required to clock in and out "[b]ecause there was no finding of any wrongdoing or error" presumably by the Department of Labor.  (Exh. 11, pg. 171).

     **D.**     **The Employer Status of Mr. Chris Ourisman.**

Defendant Chris Ourisman is the son of John Ourisman, the President of Ourisman Chevrolet.  (Exh. 11, 30-31).  Chris Ourisman is and has been the "General Sales Manager" of Ourisman Chevrolet.  (Doc. 43, ¶4).  If Chris Ourisman instructed Ms. Byrd to do something, she would "definitely do it."  (Exh. 9, 35).  Numerous salespeople have complained to Chris Ourisman  about wage issues.  (Exh. 13, pgs. 159-60).

Chris Ourisman began his full-time employment at Ourisman Chevrolet in 2006, and was listed on the dealership's website as a Sales Manager.   (Exh. 11, pg. 33-4; Exh. 13, pg. 124).  He initially worked as a Sales Manager in both the new and used car departments.  In this capacity, Chris Ourisman performed the same duties as the other Sales Managers, including but not limited to, supervising the salespeople, preparing the work schedules, and reviewing and approving time sheets.  (Exh. 18, Looney Aff. ¶ 2; Exh.19, Malone Aff. ¶ 2).  For example, Mr. Ourisman signed the weekly time sheets for James Malone, a former Plaintiff in this case.  (Exh. 19, Attach. A).

Chris Ourisman is involved in the on-the-job training for salespersons, and directs salespeople in performing their work.  (Exh. 13, pgs. 49, 116).  Chris Ourisman has set the prices at which cars could be sold and announced to salespeople what the sales campaigns would be for a particular month.  (Exh. 13, pgs. 58, 53).  He also led the sales meetings which occur  before and during the hours of operation.  (Exh. 13, pgs. 42, 44-5).  The topics at these sales meetings involved sales productivity, training requirements, manufacturer incentives, recent advertising, and sales incentives.  (Exh. 13, pgs. 38, 41).

Chris Ourisman was also involved in reprimanding and disciplining sales employees.  (Exh. 13, pg. 116).  For example, Mr. Ourisman fired William Looney, a new car salesperson, who was waiting for a customer to return from a test drive.  It was a common practice for salespeople in the new car department to allow potential customers to take a car out on a test drive without accompanying them.  When Mr. Looney questioned Mr. Ourisman's instruction to release the customer to another employee, Mr. Ourisman became enraged and fired Mr. Looney on the spot.  (Exh. 18, Looney Aff. ¶ 3).  Mr. Ourisman was working as a manager in another department at the time of Mr. Looney's termination.  (Exh. 18, ¶ 4).

Ourisman Chevrolet is a family-owned business with different family members being majority stockholders.  (Exh. 4, pg. 42).  As a member of the family which owns the company, Chris Ourisman was treated more deferentially by other Ourisman employees and managers and had more authority than other mangers in similar positions.  (Exh. 18, ¶ 4).  Mr. Ourisman became a shareholder of Ourisman Chevrolet in January, 2010.  (Exh. 13, 108).  He was given automobiles to drive which were borrowed from Ourisman Chevrolet and other Ourisman dealerships.  (Exh. 13, pg. 74).  Managers in the service, parts and body departments do not get to use demo cars like Mr. Ourisman.  (Exh. 13, pg. 75).  Chris Ourisman reports directly to his

father, John Ourisman, as opposed to the General Manager .  (Exh. 11, pg. 50).  Finally, Mr.

Ourisman held himself out as a Vice President of Ourisman Chevrolet to third parties, and uses

a business card which identifies him as a Vice President.  (Exh. 13, pgs. 121 -23)

**IV.     Argument**

> **A.     To Comply With The FLSA, Defendants Must Satisfy The Minimum Wage Obligation Each Workweek.  Defendants Have Failed To Satisfy Their Burden That They Maintain A Monthly Pay Period In Which They Satisfy The Minimum Wage Obligation For Each Workweek.**

"The purpose of the FLSA is 'to protect all covered workers from substandard wages

and oppressive working hours.' "  Shaliehsabou v. Hebrew Home of Greater Washington, Inc.,

363 F.3d 299, 304 (4th Cir. 2004) (quoting Barrentine v. Arkansas-Best Freight Sys., Inc., 450

U.S. 728, 739 (1981)).  " 'A fair day's pay for a fair day's work' " is the objective of the FLSA.

Id. (quoting Overnight Motor Transp. Co., Inc. v. Missel, 316 U.S. 572, 578 (1942)).  "To

effectuate the goals of the FLSA, courts construe coverage under the FLSA 'liberally to apply

to the furthest reaches consistent with congressional direction.' "  Id. at 305 (quoting Mitchell v.

Lublin, McGaughy & Assoc., 358 U.S. 207, 211 (1959)).

The FLSA provides that "[e]very employer shall pay to each of his employees … who

in any workweek is engaged in commerce or in the production of goods for commerce … not

less than the minimum wage."  29 U.S.C. § 206(b).  The Supreme Court has implicitly held that

an employer violates the FLSA where it "ret[ains] the workman's pay."  Brooklyn Savings

Bank v. O'Neil, 324 U.S. 697, 707 (1945).  However, many Courts have observed that the

FLSA "does not specify *when* this wage must be paid."  Rogers et al. v. City of Troy, N.Y., 148

F.3d 52, 55 (2nd Cir. 1998) (italics in original).  Nevertheless, "[C]ourts have long interpreted

the statute to include a prompt payment requirement."  Rogers, 148 F.3d at 55 (citing United

States v. Klinghoffer Bros. Realty Corp., 285 F.2d 487, 491 (2nd Cir. 1960) ("While the FLSA

does not expressly set forth a requirement of prompt payment, such a requirement is clearly

established by the authorities… .").  Courts have further observed that " 'the FLSA requires the

employer to pay *on time*.' "  <u>Rogers</u>, 285 F.2d at 56 (<u>quoting</u> <u>Calderon v. Witvoet</u>, 999 F.2d

1101, 1107 (7th Cir. 1993)).  In <u>Biggs v. Wilson</u>, 1 F.3d 1537, 1540 (9th Cir. 1993), the Ninth

Circuit held that the "only logical point that wages become 'unpaid' is when they are not paid at

the time the work has been done, the minimum wage is due, and the wages are ordinarily paid –

on payday."  Thus, "Paychecks are due on payday.  After that, the minimum wage is 'unpaid.' "

<u>Biggs</u>, 1 F.3d at 1544; <u>see also</u> <u>Salazar v. Brown</u>, 1996 WL 302673, *9 (W.D. Mich. Apr. 8,

1996) ("The general rule applied is that a claim under the FLSA accrues at the end of each pay

period the payment for which the payment fails to comply with the FLSA.").  Pay periods may

not be averaged in order to avoid paying minimum wage compensation, <u>Luther v. Z Wilson.</u>

<u>Inc.</u>, 528 F.Supp. 1166, 1173-74 (S.D. Ohio 1981), which is what Plaintiffs allege is occurring

at Ourisman Chevrolet.[4]

Courts have held that pay periods in excess of a week are permissible under the Act.

<u>See</u>, <u>e.g.</u>, <u>Olson v. Superior Pontiac-GMC, Inc.</u>, 765 F.2d 1570, 1575 (11th Cir. 1985);

Department of Labor Opinion Letter No. 63 ("while the [FLSA] does not require that the

employee's compensation must be paid weekly, it does require the employer to pay minimum

wages due for the particular work week on the regular pay day for the period in which such

work week end.").

---

[4]     Each workweek stands alone under the FLSA, and Defendants cannot challenge this as a matter
of well settled law.  <u>Blankenship v. Thurston Motor Lines</u>, 415 F.3d 1193, 1197-98 (4th Cir. 1969); <u>see</u>
<u>also</u> <u>Roland Electrical Co. v. Black</u>, 163 F.2d 417, 421 (4th Cir. 1947) ("[T]he Act takes as it standard a
single workweek consisting of seven consecutive days.").  The analytical question for this case is
whether Defendants have satisfied their burden of proving that there exists a monthly pay period in
which wages are paid sufficient to cover the minimum wage for each applicable workweek of that pay
period.

In a similar case, this Court stated:

> While Defendants are correct that the FLSA does not require that an employer utilize a pay period of any specific duration, the cases are clear that, once a pay period is established, it cannot be retroactively modified to escape FLSA liability.  For example, in <u>Sam Dell's Dodge</u>, the defendant, a car dealership, paid its salespersons a minimal base salary on a weekly basis.  The base salary was augmented by commissions and often substantial weekly, monthly, and annual bonuses. Because the employees received less than the minimum wage for the weeks where they were paid only the base pay, but substantially more for weeks involving commissions and bonus, the defendants contended that "some period other than the week should be used in assessing compliance with the minimum wage requirements of the [FLSA]." 451 F. Supp. at 301.  Specifically, they argued for what would be in effect a yearly, or in the alternative, a monthly period.  <u>See</u> <u>id</u>.  The court rejected that suggestion, observing that as salespersons were paid each week for earning which accrued during that week, there is no problem fixing the work period as one week.  "Having established the week as the applicable pay period, defendants cannot now argue that any other time period measures compliance with the [FLSA]." <u>Id</u>.

<u>Rogers, et al.v. Savings First Mortgage, LLC, et al.</u>, 362 F.Supp.2d 624, 632 (D.Md.

2005) (Nickerson, J.).  "Ordinarily, the relevant pay period is determined from the *actual*

*pattern of payments* adopted by the parties."  <u>Luther v. Z Wilson. Inc.</u>, 528 F.Supp. 1166, 1174

(S.D. Ohio 1981) (italics added) (citing cases).  "[A]n employer and employee are free to

contract for any regular pay period," subject of course to it being prompt.  <u>Id.</u> (observing that an

annual pay period cannot be adopted in light of the FLSA's basic policies).

The question, therefore, is what pay period applies in this case.  The Pay Plan provides

that the entire commission on an individual vehicle sale is paid weekly, while volume sale

bonuses are paid monthly.  (Exh. 1).  Defendants bear the burden of proof in proving the

duration of its claimed monthly pay period.  <u>Olson</u>, 765 F.2d at 1575.

### 1.      Ourisman Established A Weekly Pay Period As A Matter of Law.

Defendants have failed to satisfy their burden of proving that they have a monthly pay

period as a matter of law.  As a result, partial summary of judgment on this issue can be entered

in favor of the Plaintiffs as a matter of law.  <u>Dole v. Elliott Travel & Tours, Inc.</u>, 942 F.2d 962,

968 (6th Cir. 1991) ("Summary judgment is appropriate where the non-moving party fails to make a sufficient showing to create a genuine issue of material fact regarding a matter on which the nonmoving party has the burden of proof.") (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Defendants claim that the only evidence that exists establishing a monthly pay plan is the Pay Plan itself, together with the existence of monthly settlement sheets. (Exh. 3, pg. 161-62).

But as discussed herein, this evidence is plainly insufficient as a matter of law to carry Defendants' burden of plainly and unmistakably demonstrating a monthly pay period. In this case, it is absolutely clear that under the Pay Plan, "commissions are paid weekly, based on deliveries."[5] (Exh. 1). These commissions, set forth under Roman Numeral I of the Pay Plan, are equal to 20% of the "unit gross profit of a new or used vehicle." (Exh. 1). There is no hold back of that commission, and while Mr. John Ourisman evaded and refused to answer repeated questioning as to his claim that the commission was a "partial" commission, (Exh. 11, pgs. 74-75, 94-98), Mr. John Ourisman was forced to return to a deposition and therein admitted that "partial" does not appear anywhere in the Pay Plan. (Exh. 7, pg. 208). Likewise, after Mr. Abbas Khademi began testifying and referring to the payments in Roman Numeral I as "stipends," he was forced to admit that no such term appears in the Pay Plan. (Exh. 4, pg. 84). Testifying as the corporate designee, Mr. John Ourisman admitted that nothing is withheld from the weekly commission. (Exh. 3, pg. 173).

Likewise, Roman Numeral II plainly provides for a volume "monthly bonus." (Exh. 1). This bonus is paid by using a two-month "look back" to determine the average number of

---

[5]     The President of Ourisman Chevrolet, Mr. John Ourisman, has admitted that the document speaks for itself. (Exh. 7, pg. 249).

automobiles sold.  (Exh. 7, pg. 223).  Mr. John Ourisman has admitted that it is possible to

receive commissions under Roman Numeral I and not bonuses under Roman Numeral II.  (Exh.

7, pgs. 225-26).  Mr. John Ourisman also admitted that there was no draw paid to salespersons

at Ourisman Chevrolet, and admitted that it was possible that a salesperson might not receive

any pay whatsoever for a particular workweek.  (Exh. 3, pgs. 99-100).  Mr. John Ourisman

admits that the Pay Plan is not referred to as a "monthly commission plan."  (Exh. 3, pg. 40)

Over and over, Defendants have chosen to conveniently claim that they have a monthly

pay period, by resting entirely on the notion that they pay "partial commissions" and "stipends"

on a weekly basis.  But this argument does not create a genuine disputed issue of material fact.

Ourisman Chevrolet is not the first automobile dealership to be sued under the FLSA by

its salespersons.  In Olson, supra, the Eleventh Circuit reviewed an FLSA decision of a District

Court involving a salesperson who sued for the minimum wage.  In that case, just like this case,

there was a question of what was the applicable pay period.  In Olson, the dealership Defendant

used a multiple of methods to compensate its salespersons.  Id. at 1572.  There were daily cash

bonuses, monthly bonuses based on volume sales, and commissions paid on the sale of

automobiles based on a percentage of gross profits – just like this case.  Id.

Similarly, the salespersons in Olson received both weekly and monthly checks – just

like this case.  Id.  But unlike this case, in Olson, each week the salespersons were only paid

**70%** of the total commissions earned the previous week.  Id.[6]  The evidence demonstrated that

the dealership deducted taxes, medical insurance premiums, and other expenses from the

weekly paychecks.  Id. at 1573.  At month end, the monthly check consisted of **30%** which was

---

[6]     Like Olson, Ourisman Chevrolet deducts taxes and other expenses from the weekly paychecks.
(Exh. 14, Rose Aff., Exh. A).

withheld from the weekly checks.  Id. at 1572.

Concluding that a monthly pay period could, under certain circumstances, be permitted, the Court held that the dealership had not presented sufficient evidence to establish a monthly pay period.  Id. at 1577.  The Court distinguished the facts in Olson from another dealership minimum wage case, Marshall v. Allen-Russell Ford, Inc., 488 F.Supp. 615 (E.D. Tenn. 1980), on the basis that there were regular weekly checks and unlike the weekly checks in Marshall, deductions were taken from the weekly checks in Olson.  Id. at 1575.  Moreover, the Court reasoned that there was no sufficient evidence to establish that the salespersons believed that they were compensated pursuant to a monthly or weekly plan.  Id.

If the Court in Olson reached such a decision where part of the commission was withheld until the end of the month, then *a fortiori*, the Defendants in this case cannot establish as a matter of law that it has a monthly pay period.  Olson, supra; Marshall, supra.  In this case, it is undisputed that 100% of the commissions earned on a weekly basis were paid on a weekly basis (unless Ourisman deducted the salespersons' money to satisfy business expenses and losses).

Moreover, there is no evidence whatsoever that the Pay Plan was given out to salespersons before they began working at Ourisman Chevrolet.  For example, Ms. Carla Hampton, testifying as the corporate designee, testified that she did not given out the Pay Plan nor go over it with the salepersons.  (Exh. 8, pg. 8).  Furthermore, the Pay Plan was not included in the packet of materials provided to new employees.  Id.  Moreover, Ms. Teresa Bryd, also testifying as the corporate designee, testified that she did not know whether the Pay Plan was given to salespersons when they started their employment.  (Exh. 6, pgs. 14-15).  On the other hand, Mr. John Ourisman testified that salespersons are either given the Pay Plan or

given a copy of it to review at the start of their employment, and that salespersons sign written acknowledgements that they have read it, understand it, and comprehend it.  (Exh. 3, pgs. 16-17).  Mr. John Ourisman claimed that he drafted the acknowledgment of receipt, that it is "signed in every instance," and if it was missing from a personnel file, the most likely reason was because the employee "may have neglected or forgotten to turn it back in."  (Exh. 3, pgs. 20-22).

But a reasonably jury could never credit Mr. John Ourisman's insistence that the acknowledgment is "signed in every instance."  Mr. John Ourisman admits that he does not who, in practice, actually collects these acknowledgements.  (Exh. 3, pg. 24).  Nor does he know where they are maintained.  (Exh. 3, pg. 25).  Ms. Carla Hampton denied any involvement in disseminating any such acknowledgment form.  (Exh. 8, pg. 9).  Moreover, Ms. Teresa Bryd did not believe that there was an acknowledgment form to the Pay Plan, as described by Mr. John Ourisman.  (Exh. 6, pg. 17).

Defendants point to the monthly settlement sheets as support for the existence of a monthly pay period.  But a reasonable jury could also conclude that the monthly settlement sheets are not at all probative of a monthly pay period.  For example, the monthly settlement sheet does not detail the weekly commission earnings and many of the monthly settlement sheets demonstrate that the monthly earnings are zero or negative – one would think that if Defendants' had a monthly pay period – then that pay period would produce the majority of income for the month – but it does not.  (Exh. 5).  In fact, at Ourisman Chevrolet, negative monthly earnings are carried forward and deducted from future monthly earnings.

In sum, the evidence here demonstrates that the payment (if any) of bonuses on the 10th of each month can only be considered for the week in which they are actually paid.  <u>See</u>

Marshall v. Sam Dell's Dodge Corp., et al., 451 F.Supp. 294, 304 (N.D.N.Y. 1978) ("the

payment of bonuses can only be considered in connection with the minimum wages for the

week in which they are paid," rejecting notion that monthly bonus payment could be credited

against the minimum wage requirement for any prior workweek).  Having chosen to pay full

100% commissions each week, and to take full deductions from these weekly pay checks, the

Defendants cannot establish as a matter of law that there pay period is anything other than

weekly.

> **2.      Defendants Should Be Estopped From Claiming A Monthly Pay
>          Period.**

Even if this Court was tempted to accept Defendants' view of the World, it must

remember that Defendants did not even follow their Pay Plan on a monthly basis.

In particular, it is clear that the Defendants have admitted that there exists 24 minimum

wage violations – using a monthly pay period (there are even more when using a weekly pay

period, the position advanced by Plaintiffs).  (Exh. 3, pg. 109).[7] Defendants acknowledge that it

unacceptable to have 24 errors.  (Exh. 3, pgs. 150-51).  If Defendants truly followed what they

characterize as a monthly Pay Plan, they repeatedly violated the minimum wage guarantee

expressed in it.  (Exh. 1, pg. 5).

Defendants should not be allowed to put "humpty dumpty back together again."  They

should not be able to claim that they pay and guarantee the minimum wage on a monthly basis

when they do not do so.  A reasonable jury could conclude that Carla Hampton does not even

---

[7]      Even using a monthly pay period, there are actually far more than 24 FLSA violations.  First,
Defendants admit using gross wages in performing their alleged minimum wage calculations, and,
therefore, improperly credit many impermissible deductions for their own business expenses and losses
against the minimum wage. (Exh. 8, pg. 25, 30).  Second, the alleged calculations were based upon the
fraudulent time sheets obtained by their managers.  (Exh. 14, Rose Aff., ¶¶ 4-5; Exh. 15, Merrick Aff., ¶
4).

perform monthly reconciliations of the minimum wage.  Even after settling the companion case

to this case, Winchester et al. v. Ourisman Imports, Inc., Civ. No. 08-3445, the Defendants have

continued to deny salespersons the minimum wage. (Exh. 20, Dickerson Aff., ¶ 4).  The

premise upon an employer establishing a pay period longer than workweek carries an

obligation: that if the employer fails to maintain such a pay period, the default workweek

standard under the FLSA applies.  It would be entirely inequitable to allow the Defendants to

claim that they have a monthly Pay Plan, when their Pay Plan was not even followed.  To allow

Defendants the luxury of calculating the minimum wage on a monthly basis, when there is no

evidence that they consistently did so without fail, would create a substantial incentive for sales

employers to ignore compliance with the minimum wage laws, because the financial risk

associated with non-compliance would be relatively small if the employer could retroactively

calculate the minimum wage on a monthly basis.  See generally Hunter et al. v. Sprint Corp., et

al., 453 F.Supp.2d 44, 61 n.19 (D.D.C. 2006) (observing that allowing the fluctuating

workweek method to be used in misclassification cases would create a substantial incentive to

err on the side of misclassification, as any risk associated with the misclassification would be

relatively small).

In Reich v. Scherer Buick Co., 887 F.Supp.2d 1142 (C.D. Ill. 1995), an automobile

dealership was sued by the Department of Labor for failing to pay salespersons the minimum

wage.  In Scherer Buick, the commission settlement period for salespersons was seven days,

and if a salesperson failed to sell an automobile during that seven day period, he would receive

no pay for that period – just like the salespersons at Ourisman Chevrolet.  Id. at 1143.  After the

Department of Labor investigation, the employer agreed with the sales employees that it would

amend the commission settlement agreement and provide a pay period of 28 days, and that it

would be retroactively applied over the period in which the Department of Labor had determined that back wages were owed.  Id. at 1143-44.  The Court rejected the dealership's plan, concluding that "Defendants set the settlement period at seven days, thus, corresponding to one workweek.  The minimum wage becomes vested and is owed the employee at the completion of the work period."  Id. at 1145.  The Court concluded that the employer's attempt to "retroactively amend its commission settlement period is no more than a blatant attempt to retroactively decrease the wages owed their employees.  This is contrary to the purpose of the FLSA, and the Court finds that such a retroactive amendment should not be allowed."  Id.

Similarly, having chosen a weekly commission settlement period, Defendants should not be excused from non-compliance with their Pay Plan, and should not be allowed to calculate the minimum wage on a monthly pay period.  To allow the Defendants do to so would create a perverse incentive for the Defendants to ignore their Pay Plan's monthly minimum wage guarantee, and commit future violations knowing that repayment of the minimum wage would be virtually inconsequential.

**B.     Plaintiffs Are Entitled To Summary Judgment On The Issue Of Whether Business Expenses and Business Losses May Reduce An Employee's Wages Below The Statutory Minimum Wage.**

The parties dispute the manner in which minimum wages are to be calculated.  See (Doc. 78).  The Defendants claim that they can calculate the minimum wage based on gross earnings, and the Plaintiffs disagree and claim minimum wages cannot include business expenses recouped by Defendants in the form of wage deductions.  As set forth above, these "AR" deductions include hold notes, customer payoffs, cash shortages, sales licenses, warranty work on used car purchases, deductibles on cars damaged by salespersons, work shirts (with the Ourisman logo), and the year-end or Christmas bonus savings plan.  In addition, AR deductions

can include deductions for child support orders, health insurance payments, and Court ordered garnishments; the Plaintiffs do not dispute that the Defendants can legally reduce an employee's wages below the minimum wage in order to satisfy obligations to third parties ("valid deductions").  Plaintiffs' claim that the deductions relating to business losses and expenses are impermissible deductions as a matter of law, and that Defendants have not segregated the AR deductions, and therefore, Defendants have failed to satisfy their burdens of proof and persuasion that any of the AR deductions are permissible.

### 1. Impermissible Deductions For Business Expenses and Business Losses May Not Be Credited Towards The Minimum Wage.

It is axiomatic that "[w]hen the employer is an employee's creditor, repayment may not generally be made by deductions that reduce the employee's net pay below the minimum wage, even where the employee apparently consents to such an arrangement."  Kearns et al., THE FAIR LABOR STANDARDS ACT, pg. 544 (ABA/BNA 1999); Brennan v. Veterans Cleaning Serv., Inc., 482 F.2d 1362, 1370 (5th Cir. 1973).  This well-established rule is based on the fact that the minimum wage must be received "free and clear" of improper deductions.  29 C.F.R. § 531.35 (providing that wages must be received "free and clear" of improper deduction); see also Arriaga v. Florida Pacific Farms, LLC, 305 F. 3d 1228, 1241 (11th Cir. 2002) ("The FLSA prevents improper deductions from reducing the wages of a worker below the minimum wage …"); Garcia et al. v. Frog Island Seafood, Inc., 644 F.Supp.2d 696, 709 (E.D.N.C. 2009) ("… the issue is whether any deduction occurring during a particular workweek reduced a worker's wages for that workweek below the minimum wage.").

The foundation case in this area, Brennan v. Veterans Cleaning Serv., Inc., 482 F.2d 1362, (5th Cir. 1973), held that deductions from an employee's wages to pay for the employer's truck, which had been wrecked by the employee in a drunk driving accident, were

impermissible to the extent they reduced the employee's net wages below the statutory

minimum wages.  The Court observed:

> It is true that an employee may have a bona fide undisputed debt to his employer, not arising out of a loan transaction, and that repayment of the debt by means of paycheck deductions represents a benefit to the employee, but we do not believe that this type of benefit is the free and clear minimum payment required by the FLSA as wages.  Nor may the otherwise impermissible deductions be authorized by a 'voluntary' assignment of wages by the employee.  It has long been recognized that the protections afforded by the Fair Labor Standards Act may not be waived by agreement between employer and employee.  Brooklyn Bank v. O'Neil, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945).

> Id. at 1368.

Over and over, Courts have found in favor of workers whose pay has been reduced

below the minimum wage for business expenses and losses that primarily benefit the employer.

See, e.g., Demezier v. Ravede Insurance Agency, Inc., et al., 2010 WL 680837, *1 (S.D. Fla.

Feb. 18, 2010) (insurance license); Frog Island Seafood, Inc., supra at 708-09 (E.D.N.C. 2009)

(transportation, border crossing expenses, and knives); De Leon-Granados, et al. v. Eller &

Sons Trees, Inc., 581 F.Supp.2d 1295 (N.D. Ga. 2008) (passport, visa, travel, and border

crossing expenses for nonimmigrant laborers); Calderon et al. v. Witvoet, et al., 999 F.2d 1101,

1107-08 (7th Cir. 1993) (employer held savings account).

No reasonable jury could conclude that the deductions for hold notes (the practice of a

salesperson guaranteeing a customer's down payment to obtain financing), customer payoffs

(the practice of deducting from commission for the actual trade-in value), cash shortages, sales

licenses, warranty work on used car purchases, deductibles on dealership cars damaged by

salespersons, and work shirts (bearing the Ourisman logo) are anything other than attempts by

Defendants to recover the business losses or expenses of Ourisman Chevrolet from its

salespersons and are incurred primarily for the benefit of Ourisman Chevrolet.  No reasonable

jury could conclude that these deductions are a loan to the employee or are being paid to a third party at an employee's request.  See Brennan, 482 F.2d at 1369.  Defendants recognize that these deductions are taken when a salesperson owes money to Ourisman Chevrolet.  (Exh. 2, pgs. 59-60).  Where, as here, the employer benefits from deductions made to satisfy a debt owed to him, such deductions are prohibited to the extent they cut into the minimum wage, and Plaintiffs are entitled to summary judgment with respect to this issue, as a matter of law.

Whether deductions taken for pay for the "Christmas" or "year end" bonus under the Pay Plan may reduce a salesperson's pay below the minimum wage is likewise a legal issue ripe for summary judgment.  It is undisputed that Defendants have a "year end bonus" in which they deduct $5.00 per auto sale during the year, and at the end of the year, the Defendants offer to reimburse an amount equal to $15.00 per auto sale.  (Exh. 1, pg. 3).  (Defendants have admitted that they would even take deductions for business expenses *from this payment*.  (Exh. 4, pgs. 83-86)).

In Calderon v. Witvoet, 999 F.2d 1101, 1106 (7th Cir. 1993), the employer's practice of withholding up to 50¢ per hour from the wages of seasonal laborers to be paid as a "bonus" when the workers left their employment at the end of the harvest was found to be impermissible because retaining any part of the minimum wage past the end of the pay period violates the FLSA.  Id. at 1106 ("If the FLSA requires timely payment in cash or a cash equivalent such as a check, and this requirement may not be varied by agreement, it follows that even the workers' enthusiastic assent to deferred payments – a form of employer-held savings account – is ineffectual").  Accordingly, Ourisman Chevrolet's practice of deducting $5.00 per sale to fund a "year end" or "Christmas" bonus may not be counted towards the minimum wage.  (Exh.1, pg. 3).

Accordingly, Plaintiffs request partial summary judgment that all AR deductions for hold notes, customer payoffs, cash shortages, sales licenses, warranty work on used car purchases, deductibles on cars damaged by salespersons, work shirts (with the Ourisman logo), and the year-end or Christmas bonus savings plan are deductions, which if taken, may not reduce a salesperson's weekly pay below the statutory minimum wage.

     **2.**    **All Of The AR Deductions Are Invalid Because Defendants Failed To Segregate Permissible And Impermissible Deductions.**

Regrettably, Defendants admit that these AR deductions are "frequent.  (Exh. 4, pgs. 174-5).  It is undisputed that Defendants' payroll records indiscriminately list all of the impermissible deductions together with a variety of permissible deductions for health insurance, child support and other legal garnishments.  (Exh. 2, pgs. 83-85).  None of the AR deductions are itemized on the paycheck.  Id.  It is well-settled that the employer "bears burden of segregating permissible deductions from impermissible ones."  Demezier v. Ravede Ins. Agency, Inc., et al., 2010 WL 680837, *1 (S.D. Fla. Feb. 18, 2010) (quoting, Brennan, supra, 482 F.2d at 1370)   Indeed, the Department of Labor's regulations require employers to keep records reflecting 'the dates, amounts, and nature of the items which make up the total additions and deductions."  29 C.F.R. § 516.2(a)(10).  Thus, even valid deductions, such as, deductions at the direction of the employee to pay third parties, may not be credited as wages where they are commingled with invalid deductions and can not be separately shown.  Brennan, supra, 482 F.2d at 1370.

The employer in Brennan, like the Defendants in this case, indiscriminately listed all the deductions it took against employee wages under the heading "miscellaneous deductions."  Brennan, 482 F.2d at 1370.  Because some valid deductions were commingled with invalid

deductions, the Fifth Circuit affirmed a District Court's ruling that **all** deductions were invalid.
Id. at 1370.

The business records produced in this case have not demonstrated that the Defendants
have carried their burden of segregating valid deductions from invalid deductions.   The
Defendants have just produced documents showing the catchall "AR deductions," and their
recordkeeping fails to demonstrate that they maintained contemporaneous records segregating
valid deductions from invalid deductions.

Accordingly, because the Defendants bear "the burden of segregating permissible
deductions from impermissible ones," Brennan, supra at 1370, summary judgment must be
entered as Defendants have failed to make a sufficient showing that their business records
create a genuine issue of material fact regarding Defendants' burden of proving invalid
deductions from valid deductions.   Defendants have simply violated the recordkeeping
provisions of the FLSA, and summary judgment is appropriate.

**C.      Summary Judgment in Favor Of Plaintiffs Is Appropriate On The Length
Of the Statute of Limitations.**

"The FLSA provides a statute of limitations of two years unless the cause of action
arises from a 'willful violation,' in which case a three-year limitations period applies."  Martin
v. Diriggi, 985 F.2d 129, 135 (4th Cir. 1992) (citing 29 U.S.C. § 255(a)).  "The standard of
determining willfulness is whether the employer either knew or showed reckless disregard, as to
whether his conduct violated the [FLSA]."  Id. (citing McLaughlin v. Richland Shoe Co., 486
U.S. 128 (1988)).

Not only should Defendants' Motion for Partial Summary Judgment be denied as to this
issue, the Plaintiffs' cross move and request that the Court enter Summary Judgment on this
issue, as well.  No reasonable jury could decide this issue in favor of the Defendants, as there is

no material dispute of facts and no reasonable jury could rationally conclude that this is something other than a systematic scheme to avoid the FLSA and defraud salespersons of its protections.[8]  There can be no doubt that the Defendants know that their practices are in clear violation of the FLSA.

Generally speaking, evidence of willfulness can include evidence that an employer has previously been investigated for FLSA violations or that there is evidence of a scheme to cover up FLSA violations.  Williams v. Maryland Office Relocators, 485 F.Supp.2d 616, 621 (D. Md. 2007) (citing cases).  For example, there may be specific warnings regarding FLSA violations which the employer ignored or there may be a loss or manipulation of records.  Id.

The evidence of willfulness in this case is undisputed.  First, there are timesheets that are missing and not accounted for, and Defendants' Office Manager, Ms. Teresa Bryd, has admitted that she knows of instances where salespersons may have worked but there might not be a corresponding timesheet.  (Exh. 6, pg. 53).  Second, it is undisputed that the practice at Ourisman included recklessly failing to critically review and total timesheets.  As the Court is aware, timesheets are critically important in determining the minimum wage properly.  However, in this case, Mr. Abbas Khademi admitted that sales managers would just sign the timesheet and not make sure that the information on the timesheet, such as the total hours worked, was accurate.  (Exh. 4, pg. 130).  Chris Ourisman admitted that it was a sales manager's responsibility to catch errors on timesheets.  (Exh. 13, pgs. 159-60).  Carla Hampton

---

[8]     Defendants argue that the Department of Labor essentially approved their Pay Plan and their wage practices.  This argument attempts to turn fantasy into reality.  It is the worst type of spin.  As an initial matter, the Plaintiffs object to any attempt by the Defendants to introduce evidence requested and not obtained in the 30(b)(6) deposition in these proceedings.  See (Doc. 97; Plaintiffs' Motion for Sanctions (Exclude Affidavit of Rashed)).  At best (assuming the introduction of evidence that should be properly excluded), Defendants' arguments create a dispute of fact.  However, Defendants do not even address the mountain of other evidence, including timesheet falsification.

did not review the timesheets  or seek to verify whether any of the information was accurate, and she simply went by the total listed.  (Exh. 8, pgs. 21, 23).  Yet, the timesheets show multiple instances where totals were corrected *only after* the lawsuit was filed.  (Exh. 6, pg. 54).

But the absolute lack of care given to timesheets pales in comparison to management's manipulation of salesperson time records.  Plaintiff Ms. Patricia Merrick states that sales managers began to refuse to sign her timesheets if she put down her actual hours of work. (Exh. 15, Merrick Aff. ¶ 4).  On one occasion, one of the sales managers crumpled up her timesheet and threw it away right in front of her.  Id.  In order to get paid, Ms. Merrick regularly had to put down less than her actual hours.  Id.  If she was not going to get a commission for that week, she would not submit a timesheet because the harassment was so bad.  Id.  Likewise, Plaintiff Mr. Sidney Rose has also submitted an affidavit that he was forced by sales managers to under-report his actual hours of work.  (Exh. 14, Rose Aff. ¶ 3). According to Mr. Rose, this was a common practice at Ourisman's used car department.  Id.

But it gets worse.  When salespersons were not forced to under-report their actual hours, timesheets were *forged*.  Mr. Rose has stated that he did not sign or prepare multiple timesheets bearing his signature.  Id. at ¶ 4.  When presented with timesheets with obviously different signatures, (Exh. 16), Ms. Teresa Bryd admitted that they looked "terrible" and that it looked like four different people had signed the timesheets.  (Exh. 6, pg. 56).

Thus, Defendants' argument in favor of Summary Judgment on this issue - is entirely misplaced as a factual matter.  There is strong evidence in this case that the Defendants knew that their timesheet practices were faulty.  There is no other explanation for this sort of systematic recklessness other than to conclude that it was done to impede enforcement of FLSA's protections.

Nevertheless, the Department of Labor's investigation and assessment of fines against Ourisman Chevrolet hardly assists the Defendants' argument of non-willfulness.  To the contrary, it only demonstrates and reinforces that the Defendants' actions were willful.  It is undisputed that in September 2005, the Department of Labor investigated Ourisman Chevrolet and found that they had violated the FLSA.  (Exh. 12).  Ourisman Chevrolet was forced to pay back wages to certain employees.  Moreover, they promised to monitor the settlement earnings of auto salespersons.  (Exh. 12).  One Court has held that "a violation of the [FLSA] is willful where undisputed evidence showed that the employer 'had actual notice of the requirements of the FLSA by virtue of earlier violations, his agreement to pay unpaid overtime wages, and his assurance of future compliance with the FLSA.' "  Herman v. Palo Group Foster Home, Inc., 183 F.3d 468, 474 (6th Cir. 1999) (quoting Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 967 (6th Cir. 1991).

Here, it is undisputed that Ourisman Chevrolet promised to monitor the settlement earnings of auto salespersons.  (Exh. 12).  But what did they do?  They instead ignored the requirement, disregarded their own faulty minimum wage "guarantee," and by their own self-serving calculations, Defendants still committed minimum wage violations.  Ms. Bryd testified that nothing changed after September 2005, and as Ms. Hampton explained, employees would have to *ask her* for the minimum wage because according to Ms. Hampton, salespersons were not the type of employees "that you would even consider looking at to see if they made the minimum wage."  (Exh. 6, pg. 51; Exh. 2, pg. 154).

For as much as John Ourisman is allegedly concerned about training Chris Ourisman, no one at Ourisman Chevrolet went to a single seminar regarding the FLSA after the Department of Labor audit.  No one contacted an attorney or an outside payroll consultant.  The only step

that John Ourisman admits to taking after the Department of Labor investigation was simply to send a copy of the Department of Labor letter to his CFO and General Manager.  (Exh. 11, pgs. 172-73).

Defendants' amazingly claim that it is undisputed that Ourisman's Pay Plan was reviewed by a Department of Labor investigator who found no FLSA violations with regard to any sales employee.  (Doc. 90-1; pg. 19).  This claim completely lacks candor.  There is no evidence in the record to demonstrate that the Department of Labor conducted any investigation of Ourisman Chevrolet's pay practices with respect to salespersons.  There is no admissible testimony that the Department of Labor reviewed the Pay Plan, much less the earning statements of the salespeople.

Plaintiffs submit that this matter is clear cut.  Defendants are clearly not entitled to summary judgment on this issue after manipulating timesheets.  To make matters worse, they have even continued, after this litigation was filed, to perform their minimum wage calculations on *gross* wages as opposed to determining whether their business-related deductions force their salespersons below the minimum wage.  (Exh. 8, pg. 25, 30-32).  However, multiple Courts have observed that taking invalid deductions that reduce employee pay below the minimum wage is per se willful conduct.  See, e.g., Calderon v. Witvoet, 999 F.2d 1101, 1108 (7th Cir. 1993) (in a deduction case, reckless disregard for well-settled interpretation of the FLSA); De Leon-Granados, 581 F.Supp.2d 1295, 1315 (N.D. Ga. 2008) (rejecting claim by Defendant that it was ignorant as to principle that requiring employees to pay for expenses incurred for the benefit of the employer functions as a *de facto* wage deduction, holding "[t]his principle … is well-established in the law.") (citing cases).  Continuing violations at the Ourisman Mitsubishi dealership, also owned by John Ourisman, with their pay practices also administered by Ms.

Bryd and Ms. Hampton, after the settlement of the <u>Winchester</u> litigation demonstrates that Mr. John Ourisman has absolutely no intention of complying with the FLSA, and a reasonably jury could only see Mr. John Ourisman as a complete FLSA scofflaw.

### D. Plaintiffs Are Entitled To Summary Judgment On The Issue of Liquidated Damages.

"An employer who violates the terms of the FLSA 'shall be liable to the employee or employees affected in the amount of the unpaid minimum wages, of their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.' " <u>Williams</u>, 485 F.Supp.2d at 620.  However, " 'if the employer shows to the satisfaction of the court that the act or omission was not a violation of the [FLSA],' a court may refuse to award liquidated damages, or may award liquidated damages in an amount less than that of the unpaid overtime compensation." <u>Williams</u>, <u>supra</u> (<u>quoting</u> 29 U.S.C. § 260)).

Under the FLSA, an employer's burden of demonstrating good faith " 'is a difficult one to meet … and [d]ouble damages are the norm, single damages the exception.' " <u>Rogers, et al. v. Savings First Mortage, LLC et al.</u>, 362 F.Supp.2d 624, 638 (D. Md. 2005) (<u>quoting</u> <u>Reich v. Southern New England Telecomm. Corp.</u>, 121 F.3d 58, 71 (2nd Cir. 1997)).  Therefore, not only is the burden on the Defendants as to this issue, but they must demonstrate an attempt to, in good faith, comply with the FLSA.  This is a "high standard." <u>Williams</u>, <u>supra</u>.  Good faith requires some duty to investigate personal liability under the FLSA. <u>Williams</u>, <u>supra</u> (<u>citing</u> <u>Rogers</u>, <u>supra</u>).  An employer cannot rely on an "ostrichlike" approach to complying with the FLSA and be relieved of liquidated damages. <u>Frog Island Seafood</u>, 644 F.Supp.2d at 712.  If an employer attempts to claim that it acted on the advice and direction of the Department of Labor, its actions must be in "actual conformity" with any such advice. <u>Olson v. Superior Pontiac-GMC, Inc.</u>, 765 F.2d 1570, 1579-80 (11th Cir. 1985),

In <u>Olson</u>, the Court observed that dealership's defense to liquidated damages was unavailing because it did not act in conformity with an administrative interpretation because the employer incorrectly interpreted the Department of Labor's position.  <u>Olson</u>, 765 F.2d at 1580. Additionally, the dealership's management had differing interpretations of the FLSA, but did not seek professional advice in order to comply with the FLSA.

The same is true in this case.  By their own skewed manner of calculating the minimum wage, the Defendants admit that they failed to pay properly under the FLSA – they just dispute the amount that is owed to the Plaintiffs.

While it is clear that the Department of Labor warned them to monitor settlement earnings of salespersons, it is equally clear that Defendants failed to do so – by their own admission.  Thus, they cannot satisfy their burden of demonstrating that they are in actual conformity with any position of the Department of Labor, as a matter of law.

Defendants also admit that they have taken no steps to audit their payroll practices, by hiring an attorney or other payroll expert.  They did not attend seminars or seek training with respect to the FLSA.  They failed to maintain proper records, by both intentionally minimizing and requiring salespersons to underreport their hours worked.  They easily could have installed a time clock for salespersons to punch in and out, but they arrogantly claim that salespersons cannot be relied upon to clock in and out, and further state getting salespersons to clock in and out is "like getting attorneys to stop doing frivolous lawsuits."  (Exh. 4, pgs. 154, 156).

The evidence demonstrates that the Defendants remain willfully violating the FLSA, which certainly prevents the Defendants, as a matter of logic, from demonstrating that they have carried their burden of proving a good faith defense to liquidated damages.

### E.       A Reasonable Jury Could Find The Chris Ourisman Is An Employer.

Plaintiffs oppose Defendants' request for partial Summary Judgment on the employer status (personal liability) of Defendant Chris Ourisman, and cross move for partial Summary Judgment on this same issue, on the basis that no reasonable jury could conclude after a review of the undisputed facts, that Chris Ourisman, the Son of Ourisman's President, John Ourisman, is anything other than a senior management officer at Ourisman, and responsible for the FLSA violations.  Given the undisputed facts, no reasonable juror could conclude that Chris Ourisman has been in a four (4) year training program, and that they would disbelieve and find all testimony in support of such a position to be incredible.

### 1.       Individual Liability Under The FLSA

Under the FLSA, an employer "includes any person acting directly or indirectly in the interest of an employer in relation to an employee."   29 U.S.C. § 203(d).   "The remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications."  McLaughlin v. Seafood, Inc., 867 F.2d 875, 877 (5th Cir. 1989); see also Quinteros v. Sparkle Cleaning, Inc., 523 F.Supp.2d 762, 768 (D. Md. 2008) (Williams, J.).   "In determining whether a party is an employer, "economic reality" controls rather than common law concepts of agency."  Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 965 (6th Cir. 1991) (citing Goldberg v. Whitaker House Cooperative, 366 U.S. 28, 33 (1961)); see also Quinteros, 523 F.Supp.2d at 768 (rejecting employer characterization or label as being controlling).   The guiding principal is that the term "employer" under the FLSA is to be interpreted expansively.  Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326 (1992).

An individual who effectively dominates an employer's administration or otherwise acts, or has the power to act, on behalf of the corporation vis-à-vis its employees, it deemed to be an employer under the FLSA. <u>Reich v. Circle C. Invest., Inc., et al.</u>, 998 F.2d 324, 329 (5th Cir. 1993). An individual need not be an officer in order to exercise control over the workplace sufficient to find FLSA employer status. <u>Id.</u> However, "[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." <u>Donovan v. Agnew et al.</u>, 712 F.2d 1509, 1511 (1st Cir. 1983) (<u>cited with approval by</u> <u>Brock v. Hamad</u>, 867 F.2d 804, 809 n.6 (4th Cir. 1989)). Ownership of the payroll employing entity is not dispositive, either. Personal liability has been found even against a corporate officer who lacks an ownership interest in the corporation, or who has minimal ownership interests. <u>Id.</u>; <u>see also</u> <u>Patel v. Wargo</u>, 803 F. 2d 632, 638 (11th Cir. 1986) (An individual need not have an ownership interest in order to be considered an FLSA employer). Rather, the individual must "either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee" in order to be considered an "employer." <u>Patel</u>, <u>supra</u> at 638.

"[T]he overarching concern is whether the alleged employer possessed the power to control the workers in question, with an eye to the 'economic reality' presented by the facts of each case." <u>Herman v. RSR Security Serv. LTD., et al.</u>, 172 F.3d 132, 139 (2nd Cir. 1999) (citations omitted). Any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition. <u>Id.</u> Employer status <u>does not</u> require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees. <u>Id.</u>

The Supreme Court held further that "managerial responsibilities" and "substantial control of terms and conditions of the work" create statutory employer status, and thereby implicitly recognized that an individual may be liable under the FLSA.  Faulk v. Brennan, 414 U.S. 190, 195 (1973).

>   **2.** **All Undisputed Facts Support The Employer Status of Chris Ourisman.**

No reasonable jury could conclude in light of the undisputed facts of this case, that Defendant Chris Ourisman is anything other than an "employer" under the FLSA.

Before the Defendants concocted this fantastic and convenient story that Chris Ourisman has been in an indefinite "training" program since 2006, the Defendants agreed and admit that Chris Ourisman is and has served as the General Sales Manager of Ourisman Chevrolet in their most recent Amended Answer.  (Doc. 43, ¶4).

Now, Defendants claim that Chris Ourisman is a "trainee," who "exercised no authority whatsoever over the dealership practices with regard to the compensation of sales employees." (Doc. 90-1, pg. 12-15).  This is an absolutely frivolous contention without factual support.

As an initial matter, there is evidence that Chris Ourisman dominates Ourisman Chevrolet.  Reich supra.  It is beyond dispute that Chris Ourisman is the son of John Ourisman, the President of Ourisman Chevrolet.  (Exh. 11, pgs. 30-31).  Although Chris Ourisman claims that his current title is "Assistant to General Manager,"[9] (Exh. 13, pg. 32), he holds himself out to others as being a Vice President and he signs documents as Vice President.  (Exh. 13, pgs.

---

[9]     Chris Ourisman claims to have no title in 2006 and 2007.  (Exh. 13, pgs. 64-65).

121-22).[10]   Chris Ourisman's business card reads: "Vice President of Ourisman Company, LLC."  (Exh. 13, pg. 122).  Chris Ourisman has never signed documents as "Assistant to the General Manager."  (Exh. 13, pg. 123).  To the contrary, he was held out by Ourisman on its website as a Sales Manager.  (Exh. 13, pg. 124).

Defendant Abbas Khademi acknowledged that the Ourisman business is a family business belonging to Chris Ourisman and other family members, and that he left Ourisman because "the Ourisman organization is a family owned business with different family members being the majority stockholders… ."  (Exh. 4, pgs. 42, 68).  Chris Ourisman agreed that he performs tasks in the interest of Ourisman Chevrolet.  (Exh. 13, pg. 164).

There is overwhelming evidence that Chris Ourisman exercised managerial responsibilities and had substantial control over the employment of other employees, including at least one management employee who took directions from him.  Faulk, supra.  For example, Ms. Byrd, the Office Manager who is part of management team at Ourisman, testified that if Chris Ourisman instructed her to do something, she would "definitely do it." (Exh. 9, 35).  In fact, Chris Ourisman has given Ms. Bryd directions as to handling certain litigation tasks associated with this case.  (Exh. 9, pg. 18).  Chris Ourisman is not supervised by the General Manager of the dealership – he is just supervised by the President, John Ourisman.  (Exh. 11, pg. 50).  Chris Ourisman is given "demo" cars to drive - borrowed from Ourisman Chevrolet and other Ourisman dealerships – a benefit not even extended to the managers of service, parts, and body shop departments.  (Exh. 13, pgs. 74-75).  On these facts, no reasonable jury could conclude, particularly given his power to direct another management employee and not

---

[10]     For purposes of this litigation, Chris Ourisman conveniently could not say for certain whether he is an Officer of Ourisman Chevrolet, but he was careful not to deny it.  (Exh. 13, pg. 121).

reporting to the General Manager of the dealership, that Chris Ourisman was anything other than an employer for FLSA purposes.

In addition, there is abundant evidence that Chris Ourisman controlled the work of salespersons.  See Faulk, supra; RSR Security Serv. LTD., supra.  First, Chris Ourisman admits that he was involved in reprimanding and disciplining salespersons, and directing them in their work.  (Exh. 13, pg. 116).  Second, Chris Ourisman has controlled the employment relationship with salespersons, as he terminated at least one salesperson "on the spot" after the salesperson let a customer take an automobile out on a test drive alone.[11]  (Exh. 18; Looney Aff., ¶ 3). Third, Chris Ourisman has been involved in setting the prices of cars for salespersons to sell, which could affect a salespersons' commissions.  (Exh. 13, pgs. 58, 153).  Fourth, Chris Ourisman has led sales meetings with salespersons where he has asked questions and provided answers, involving meeting topics such as sales productivity, training, recent dealership advertising campaigns, and manufacturer and dealership sales incentives.  (Exh. 13, pgs. 38, 41, 44-45).  Fifth, there is evidence that Chris Ourisman signed timesheets of salespersons.  (Exh. 13, pgs. 96-97; Exh. 19; Malone Aff. ¶ 2).  Finally, Chris Ourisman possesses all of the indicia of upper management as he both admits that salespeople have come to him and complained about wage issues and that he is in a position to make employment policy recommendation to his Father, John Ourisman, including such things as installing a time clock system to track salesperson hours.  (Exh. 13, pgs. 150-51, 161-62).

A reasonable jury could only conclude, based on this evidence, that Chris Ourisman, as a General Sales Manager, has "substantial control of terms and conditions of the work," Faulk,

---

[11]   Chris Ourisman does not deny that this occurred, he just claims that both he and Abbas Khademi discussed the matter and agreed upon a course of action.  (Exh. 13, pgs. 117-18).  Defendants likely challenge the significant of a single instance, but it is undisputed that sales managers had the authority to terminate employees.  (Exh. 4, pg. 65).

supra, as an "economic reality," Dole, supra.   Chris Ourisman is the alter ego of John Ourisman, his aging Father, who admits that he comes into the dealership only a few times a week.   Again, Plaintiffs need not demonstrate that Chris Ourisman had some absolute control over all aspects of the dealership.   RSR Security Serv. LTD., supra; Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 966 (6th Cir. 1991) ("To be classified as an employer, it is not required that a party have exclusive control of a corporation's day to day functions.").   This control over salespeople and the issues giving rise to the Plaintiffs' FLSA claims is dispositive – not the label that the Defendants have placed on him.

In addition to his work responsibilities and job title, there is evidence that Chris Ourisman – not surprisingly - has an ownership interesting in Ourisman Chevrolet.   Chris Ourisman has testified that he owns five percent of the non-voting stock of Ourisman Chevrolet.   (Exh. 13, pg. 121).   While Defendants will predictably claim that this ownership is minimal. or recently obtained,[12] such arguments are no defense as a matter of law.   Circle C Invest, Inc., supra; Patel, supra.   Chris Ourisman profits from Ourisman Chevrolet, and hence, the violations of the FLSA that it willfully commits.

Given the remedial nature of the FLSA, its broad and expansive interpretation, and the economic realties of the situation, which demonstrate that Ourisman Chevrolet is a family business operated by and for Chris Ourisman's benefit, it is clear that the evidence clearly demonstrates that Chris Ourisman was and remains a "top man" at Ourisman Chevrolet, and that the corporation functioned for his profit.[13]

---

[12]     Defendants have not produced any admissible evidence as to the date Chris Ourisman first became a shareholder of Ourisman Chevrolet.

[13]     Defendants want to paint a picture of Chris Ourisman as a lowly paid employee, and hence, not an employer.   However, a reasonable jury would be suspicious of such a claim given the fact that Chris Ourisman's income from Ourisman Chevrolet is socked away in his retirement account, and that uses another entity, Ourisman Company, LLC, to pay him.   (Exh. 13, pgs. 105-06, 122).

3.      **No Reasonable Jury Would Credit The Claim That Chris Ourisman Has Been In A Training Program For Four Years.**

Only an automobile dealer would believe that they can convince people that the Son of the President of the automobile dealership, who signs timesheets and has the power to terminate employees, is a trainee, has held that position for the last four years, and will remain a trainee indefinitely into the future.

A reasonable jury could disbelieve the notion that Chris Ourisman is a trainee.  Abbas Khademi did not become a General Manager by going through any training program like Chris Ourisman's alleged training program.  (Exh. 4, pgs. 60-61).  Chris Ourisman claims that his basic work duties are to "watch, look, listen on what goes on in the dealership, to try to learn from everybody I can at any level in the chain."  (Exh. 13, pg. 63).  However, this is a sheer fantasy when truly examined.

As an initial matter, a reasonable jury could find it odd that there is no formal management training program at Ourisman Chevrolet, and that the only other person who has allegedly gone through the training program was another Son, Benjamin Ourisman, at another dealership.  (Exh. 11, pg. 34).  Moreover, a reasonable jury could find it peculiar that there are no formal performance evaluations of Chris Ourisman, and no internal documents refer to him as a management trainee.  (Exh. 11, pgs. 39-40).  When asked what sort of communications that Chris Ourisman is assigned to "listen" to, John Ourisman could provide no detail.  (Exh. 11, pg. 42).  After four years of this so-called training, Chris Ourisman has no idea when the training will end and denies that he can assume the responsibilities of a General Manager, yet he cannot identify what he still needs to learn.  (Exh. 13, pgs. 87-89).  This lack of detail strongly suggests that the Defendants are attempting to label Chris Ourisman as an intern, rather than address all of the factors that point in the direction of employer status.  Cf. Quinteros, 532 F.Supp.2d at

768 ("the labels that parties themselves attach to their relationship are not controlling… .")

A reasonable jury could disbelieve this story, given the fact that Chris Ourisman has allegedly been training to become an Auto Sales General Manager longer than gifted college graduates train to become licensed Medical Physicians.  Accordingly, this Court should deny partial Summary Judgment in favor of Chris Ourisman, and rather enter partial Summary Judgment against him and hold him to the status that he has under the FLSA as an employer.

**F.      Plaintiffs Are Entitled To Summary Judgment On Issues Defendants Have Admitted.**

Plaintiffs are entitled to partial Summary Judgment on two issues that the Defendants have admitted:  (a) the employer status of Defendant Mr. Abbas Khademi under the FLSA; and (b) that the FLSA's coverage applies to Ourisman Chevrolet's operations.

**1.      Defendants Have Stipulated That Ourisman Chevrolet Is A Covered Enterprise And Employer Under The FLSA.**

Plaintiffs cross move for summary judgment that Defendant Ourisman Chevrolet is a covered enterprise and employer under the FLSA.  The FLSA's minimum wage obligations extend to employers who employ workers in an "enterprise engaged in [interstate] commerce or in the production of goods for commerce … whose annual gross volume of sales made or business done is not less than $500,000."  29 U.S.C. § 203(s)(1)(A).  Defendants have stipulated that: (i) "for all time periods relevant to the complaint filed in this matter, Defendant Ourisman Chevrolet Co., Inc. was an enterprise engaged in commerce or the production of goods for commerce within the meaning of Section 3(s)(1)(A) of the Fair Labor Standards Act, 29 U.S.C. § 203(s)(1)(A);" and (ii) "Plaintiffs were employed by Ourisman Chevrolet Co., Inc." (Exh. 21, Response to Request for Admissions, Nos. 2 and 3).  It is, therefore, undisputed that Ourisman Chevrolet is a covered enterprise and employer under the FLSA.

### 2. Defendants Have Stipulated That Khademi Is An Employer Covered By The FLSA.

Plaintiffs cross move for summary judgment that Defendant Khademi is an employer under the FLSA.  As set forth above, the FLSA defines an employer to include "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  The parties have stipulated that Defendant "Abbas Khademi is and employer for purposes of 29 U.S.C. § 203(d)."  (Exh. 21, No. 5).  It is, therefore, undisputed that Khademi is an employer for purposes of this lawsuit.

## V. Conclusion

Congress's goal in enacting the FLSA was "to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental  to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'"  Barrantine v Arkansas-Best Freight System, Inc., 450 U.S. 728, 739 (1981) (quoting 29 U.S.C. § 202(a)).  See also Marshall v. Sam Dell's Dodge Corp., 451 F. Supp. 294, 302 (N.D.N.Y. 1978) (noting "even the better paid salesman with a family would be hard pressed if he was obliged to suffer a few weeks at less than minimum wage").  Defendants have been actively involved in a systemic and long-running conspiracy to undermine these important protections and will continue to do so with the Court's intervention.

WHEREFORE, Plaintiffs request that the Court grant their Motion for Partial Summary Judgment and issue the proposed Order in their entirety.

Respectfully submitted,


_____/s/_____               _____/s/_(with permission)
Howard B. Hoffman, Esq.             Bradford W. Warbasse, Esq.
Federal Bar No. 25965               Federal Bar No. 07304
600 Jefferson Plaza, Suite 304      401 Washington Avenue, Ste. 200
Rockville, Maryland 20852           Towson, Maryland 21204
(301) 251-3752                      (410) 337-5411

*Counsel for Plaintiffs*             *Counsel for Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of October, 2010, a copy of the foregoing Plaintiffs' Motion for Sanctions, along with all Exhibits and other attachments, was filed via the Electronic Case Filing System (ECF) maintained by the U.S. District Court for the District of Maryland, and is available for viewing and downloading from the ECF system.


_____/s/_____
Howard B. Hoffman